# *Exhibit 1*

# United States District Court
# for the District of Columbia

| |
|---|
| **S.G., a minor,** *et al.,* |
| **Plaintiffs** |
| **v.** |
| **THE DISTRICT OF COLUMBIA,** *et al.,* |
| **Defendant**s |

**Civil Action No. 06-01317 (RMC)**

### AFFIDAVIT

State of Maryland )
                                        )    ss:
County of Montgomery )

Diana M. Savit, being first duly sworn, deposes and states as follows:

1.       I am an attorney admitted to practice in Maryland and the District of Columbia, as well as in numerous federal courts, including the United States District Court for the District of Columbia. I have represented plaintiffs S.G., Harwant Gill and Aleksandra Parpura-Gill since they first requested special education for S.G. from the District of Columbia Public Schools ("DCPS"), in 2005.

2.       I am over 18 years old and suffer from no legal disability that would prevent me from giving testimony. All statements contained in this affidavit are made upon my personal knowledge, are derived from information in the record, or are derived from information which I maintain in the ordinary course of my business.

3.      As indicated in my resume, a copy of which is attached as Exhibit 1A, I have practiced law for over 31 years, 29 of them as a civil litigator. I have brought and defended a variety of civil cases, in both the public and private sectors. Over the years my practice has evolved; since approximately 1994, I have specialized in three substantive areas: commercial litigation, civil rights and discrimination cases, and special education. Cases in two of these areas—civil rights/discrimination and special education—usually are brought under fee-shifting statutes; *i.e.,* a prevailing plaintiff is entitled to recover his/her attorney's fees and costs from the defendant. As a result, I have substantial experience not only with general civil litigation, but also with fee petitions. I estimate that I have applied to courts and administrative agencies for fees at least 60 times, on behalf of parties who prevailed on the merits as well as for other types of fee awards, such as discovery sanctions. Only one of my fee requests has ever been denied. That denial was not on the merits, but was due to the effect of the restrictions upon special education fee payments (in cases brought pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA")) contained in the FY 2002 District of Columbia appropriations act; indeed, the District of Columbia conceded both the appropriateness of my hourly rate and the number of hours worked even while opposing that motion on the grounds that it could not legally pay, because of the fee cap, the full amount requested. Only a handful of the fee requests I have submitted over the years have been reduced and of those, most of the reductions have been adjustments for computational errors on my part rather than the products of substantive disagreement with either the hours I worked or the hourly rates claimed.

4.      I stay current regarding developments in the law governing reasonable attorney's fees through professional reading, attending courses, consultations with other lawyers, reading the fee requests of other lawyers with similar practices, and reading reported decisions regarding awards in fee-shifting cases. For the 23 years I have been in private practice, I have always followed the same

method in selecting my rate:  I ascertain the range of rates charged by lawyers of my experience, and

then I select a rate toward the mid-point of the scale.  I do this as a matter of business judgment, to

establish a competitive position in the marketplace, and because the small firms in which I have

practiced have kept their overhead low, creating less need to charge clients high rates in order to

recover the costs of operating the business.  I followed this procedure in establishing the $350 hourly

rate I currently charge, as well as the $295 rate I was charging when the Gills first retained me and

the $325 hourly rate I charged in 2006 and 2007.  All of the referenced hourly rates are charged to

and paid by all clients who do not have special arrangements, thus establishing the market rate for

our firm's services.


5.       All of the fee petitions that I have submitted to courts and administrative agencies

have sought fees at my then-current hourly rates.  In the vast majority of my fee requests, my

adversaries have conceded the appropriateness of my then-current rate without question.  Indeed,

over the past 23 years whether my hourly rate was proper has been questioned only five times and

in four cases, the matter was resolved in my favor.  In 1988, in an action brought before the Superior

Court of the District of Columbia under the federal Magnuson-Moss Act, Associate Judge Paul R.

Webber, III (later the presiding judge in the Superior Court's Civil Division) initially reduced my

hourly rate to the lower one charged by my opposing counsel, but later reversed himself and ruled

that my hourly rate represented fair compensation.  In 1989, I successfully sought sanctions pursuant

to Sup. Ct. Civ. R. 11 and received fees at my then-current hourly rates on an order entered by

Superior Court Associate Judge Franklin Burgess, despite a claim by opposing counsel that my rate

was too high.  In connection with a request for discovery-related attorney's fees in *Mary Ann White

v. United States Catholic Conference,* Civil Action No. 97-1253 (TAF)(JMF), my rate was

challenged, but unsuccessfully.  In a memorandum opinion filed March 31, 1999, Magistrate Judge

John M. Facciola specifically found that my 1998-99 hourly rate of $225 was not excessive, and

noted that given my experience, I could have claimed an hourly rate as high as $330 under the version of the Court's *Laffey* matrix in effect at that time. Most recently, in *Marthine Mason, et al. v. Board of Education of Prince George's County,* Case No. CAL 02-25638, Judge Thomas Smith of the Circuit Court of Maryland for Prince George's County approved (over strenuous objection by the defense) my $295-per-hour rate (for work performed in 2004) as consistent with the market for my services. His memorandum opinion issued on May 23, 2005.

6.     My hourly rate was challenged only one other time, in *Karen Young, et al. v. Federal Express Corporation, et al.,* Civil Action No. 202413, a case filed in the Circuit Court of Maryland for Montgomery County. The court never decided the question because the case settled on appeal as to all issues, including the attorney's fee claim, before the trial court could rule on the fee motion.

7.     My hourly rates have also been specifically approved in fee awards made by the United States District Court for the District of Columbia in *Andrew Beale, et al. v. District of Columbia, et al.,* Civil Action No. 97-00974 (CKK) (the Court entered five separate fee awards in that case, three for discovery sanctions and two for work on the merits); *Paul D. Pearlstein, et al. v. District of Columbia, et al.,* Civil Action No. 98-01877 (GK); *Thomas and Jean Zearley, et al. v. Arlene Ackerman,* Civil Action No. 98-2146 (RCL); *Jamel Whatley, et al. v. District of Columbia, et al.,* Civil Action No. 98-02961 (PLF)(JMF); and *Evan Fisher, et al. v. Clifford B. Janey, et al.,* Civil Action No. 05-738 (EGS)(JMF). In the *Whatley* case, the Court entered four separate fee awards, three for discovery sanctions and one pursuant to a settlement. Most recently, in two separate orders entered on, respectively, May 10, 2007 and July 20, 2007, the Superior Court of the District of Columbia (Eilperin, J.) awarded me fees at my 2007 rate in *Debra A. Schwartz v. John G. Bickerman,* Misc. No. 00835-07. Except for the Superior Court's award in *Schwartz v.*

*Bickerman,* which was a miscellaneous proceeding brought to enforce a subpoena in a domestic relations matter, all of the cited cases were special education actions.

8.    The hourly rates charged in this case are, based upon my knowledge and experience, well within the metropolitan Washington, D.C. market rate for professionals of my experience and are below the rates for professionals at my level of experience found on the *Laffey* matrix maintained by the office of the United States Attorney for the District of Columbia.  The current *Laffey* matrix can be found at http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_3.html. The matrix sets the hourly rate for attorneys with 20 or more years of experience at $380 per hour.

9.  My firm followed its standard timekeeping practices in this matter, meaning that I kept contemporaneous record of my time by recording my efforts daily in Timeslips™, the time and billing program that we use.  Expenses charged to our firm by outside vendors are recorded by me or by one of our support staff when bills are received or when we become aware of them.  The latter process is followed primarily with respect to expenses charged by our landlord, such as postage and photocopying.  These are billed monthly with our rent.

10.    Our firm typically bills in increments of .1 hour.  This reduces the overall fees charged to our clients by minimizing the "rounding up" effect created by billing in larger increments of one-fourth or one-half hour.  To make up for the potential overbilling that even this practice can engender if a task takes only a minute or two, I tend to group multiple tasks together in a single entry if I do several short projects in a single day, such as brief letters and telephone calls.

11.    In addition to *pro bono* legal work, for which of course no fee is charged, I typically charge clients a reduced hourly rate only in the following circumstances: (a) friends and

members of the families of persons affiliated with my law firm receive a 20% discount from the hourly rate otherwise in effect at the time I am retained; (b) when the facts and nature of the case make it appropriate, I enter into a fully or partially contingent fee arrangement; and (c) if my hourly rate increases before a matter for which I originally was retained at a lower rate concludes, I maintain the original rate until I complete that representation. In all such cases, if my clients have the opportunity to ask their adversaries to pay their legal fees, the request is made at my current market rate, consistent with the rule established in *Laffey v. Northwest Airlines, Inc.*, 746 F.2$^d$ 4 (D.C. Cir. 1984).

12.      When the Gills first engaged my services, my hourly rate was $295. As a courtesy to them, and consistent with the practice described in ¶11, I maintained that rate when my billing rate increased to $325 on January 1, 2006. As a additional courtesy to them, when we received the hearing officer's determination and amended hearing officer's determination that were appealed to this Court in this matter, I further reduced my non-contingent rate to them to $236 per hour, with the understanding that if we succeeded in our efforts to overturn the adverse portions of the determinations and were awarded attorney's fees, I would seek those fees at my full rate and they would make up the difference between the discounted rate and my regular one. I did this because the Gills had already incurred substantial legal fees, and were concerned about the additional cost of challenging the hearing officer's erroneous ruling. I entered into a partial contingent fee arrangement with them to share the risk of going forward in order to achieve a better result for S.G.

13.      Consistent with my partial contingency arrangement with the Gills, after the Court reversed the first hearing officer's determination that was at issue, and we then obtained further relief at the second due process hearing in October 2007, I billed them for the incremental

difference between the reduced hourly rate to which we agreed in 2006 and my true hourly rate.  The Gills have paid this sum in full.

14.    I have examined my firm's billing records and have determined that a total of 20.45 hours were expended on the tasks related to the case before this Court through the Court's August 8, 2007 decision to reverse the hearing officer's determination which the Gills had appealed. Of these, 5.7 hours were not charged to the Gills, making the total value of the billed time $4,793.75 (14.75 x $325).  Copies of my firm's statements for this work, redacted to remove time and billing entries unrelated to the district court case, are attached as Exhibit 1B.  These fees were claimed in the Gills' first motion for an award of attorney's fees and costs, which the Court denied without prejudice to later renewal.

15.    Since submitting the first motion for attorney's fees and costs, I have spent additional time litigating the Gills' successful motion to alter or amend the Court's judgment that they did not prevail at the first due process hearing, in filing the first motion for attorney's fees and costs (which formed the basis for this motion), and in complying with the Court's post-judgment instructions to file a status report.  My review of my firm's billing records indicates that I spent a total of 10.1 hours on these tasks, of which 1.6 hours were not charged to the Gills, making the total value of the billed time $2,802.25 (6.9 x $325 + 1.6 x $350)These fees and costs are reflected in the redacted records submitted as Exhibit 1C.

16.    Our firm's records also reflect that the following expenses, all reflected on Exhibits 1B and 1C, were incurred in connection with this case:

New case filing fee                                            $350.00

Couriers                                                            90.00

| | |
|---|---|
| Postage | 13.23 |
| Photocopying | 12.80 |
| **Total** | **$466.03** |

We pass through all expenses to our clients at their cost to us. We do not mark up expenses.

17.    Following the Gills' success in the October 2007 due process hearing, I submitted administrative requests for reimbursement of their legal fees and expenses to DCPS. Copies of those requests and their accompanying explanatory cover letter are attached as, collectively, Exhibit 1D. I asked DCPS to reimburse $12,488 in legal fees and $151.42 in expenses in connection with the Gills' 2006 due process hearing, and separately asked for $13,747.50 in legal fees and $610.67 in expenses in connection with the 2007 due process hearing.

18.    For the reimbursement request related to the January 2006 due process hearing, DCPS disputed 2.6 of the hours claimed, characterizing them as "pre-hearing." DCPS also disputed my hourly rate of $325 and instead awarded fees at $275 per hour, without explanation. Thus, of the $12,488 in fees requested, DCPS approved $9,930. Pursuant to the special education legal fee cap currently in the effect in the District of Columbia, DCPS paid $4,000 of the allowed amount. DCPS approved my request for expenses in full. A copy of DCPS's dispute sheet is attached as Exhibit 1E.

19.    For the reimbursement request related to the October 2007 due process hearing, DCPS again disputed my $325 per hour rate and substituted $275 per hour, without explanation. It challenged none of the time expended. Thus, of the $13,747.50 in fees requested, DCPS approved $11,632.50. Pursuant to the special education legal fee cap currently in the effect

in the District of Columbia, DCPS paid $4,000 of the allowed amount. DCPS approved my request for expenses in full. A copy of DCPS's dispute sheet is attached as Exhibit 1F.

20.        After receiving DCPS's analysis of the two fee/expense reimbursement requests, I wrote to DCPS to explain why I though the disallowed time should be approved and why I should be compensated at my market rate, as opposed to an arbitrarily selected lower one. A copy of my letter is attached as Exhibit 1G. DCPS has never responded.

21.        Absent the requested explanation, I assume that the reason DCPS unilaterally reduced my hourly rate is that its October 1, 2006 guidelines for paying attorney's fees in special education cases presume that the reasonable hourly rate for attorneys with more than eight years' experience is $275 per hour. I further understand that DCPS believes that special education litigation is simple and therefore that special education attorneys should not be paid at the same rate as similarly experienced practitioners of other legal specialties. This misconceives what is involved in a special education case. The IDEA is a complicated statute that is learned well only over time. Litigating a special education case requires understanding not only the historical facts of the specific case and the law, but also the work and diagnoses of professionals from a variety of disciplines who have worked with the client. In S.G.'s case, for example, he had been in special education for many years and has multiple disabling conditions (severe medical problems, learning disabilities and speech-language impairment) as well as emotional fallout from those conditions. Advocating for S.G. required thorough preparation.

22.        This was compounded, not eased, by the lack of discovery in the typical special education case. The only way an attorney for a student can obtain first-hand knowledge about DCPS's views of her client's needs is to attend individualized education plan ("IEP") meetings

for the student.  Under IDEA, however, attorney's fees incurred in attending these meetings cannot

be reimbursed even if the student/parents ultimately prevail in litigation.  Thus, a significant amount

of the lawyer's work is done in a manner that does not show up in a subsequent request for fees.  In

my fee applications, for example, I remove all references in my billing records to my attendance at

IEP meetings because they are not properly claimed as part of the reimbursement request.


      23.     Furthermore, because no one knows–until five business days before a due

process hearing–the facts, witnesses or exhibits likely to be used by the other side, an attorney in a

special education case must prepare for all contingencies.  This frequently can involve anticipating

witnesses who are not called to testify, exhibits that are not offered or legal arguments that are not

made.  For this reason, experienced special education counsel are highly sought after, and they

charge accordingly for their services.

> I solemnly affirm under the penalties of perjury and upon personal
> knowledge that the contents of the foregoing paper are true and correct.


              /s/     *Diana M. Savit*

              Diana M. Savit

Executed on:   May 27, 2008